DRIVERS, WAREHOUSE & DAIRY EMPLOYEES UNION, LOCAL No. 75, Appellant, v. WISCONSIN EMPLOYMENT RELATIONS BOARD, Respondent.

*November 4—December 3, 1965.*

For the appellant there was a brief by *Goldberg, Previant & Uelmen* of Milwaukee, and oral argument by *David Leo Uelmen.*

For the respondent the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HALLOWS, J.   There is no dispute over the facts as found by the WERB. Menominee was engaged in refining sugar from sugar beets in its plant in Brown county and sold its sugar under the trade name of "Crystal Pure." On July 1, 1960, it entered into a three-year collective-bargaining agreement with the petitioning union Drivers, Warehouse & Dairy Employees Union Local No. 75, International Brotherhood of Teamsters (union). This agreement covered all the part-time plant workers or "campaign workers" and provided for the

usual seniority rights, wage, hours, working conditions, checkoff of dues, grievance procedure, arbitration and other matters. During the summer of 1961 machinery for the refining of cane sugar was installed and Menominee produced some cane sugar for about a month but was primarily engaged in refining sugar beets.

On December 31, 1961, Menominee discontinued operating the refinery, terminated all of its campaign employees, and sold a portion of its sugar-beet-refining equipment which was removed from the plant. As a result, the plant could no longer be used for refining beet sugar. The plant remained idle from January to July 7, 1962, except for a short time Menominee retained five or six shipping employees. On July 7, 1962, Menominee leased its plant, warehouse and equipment to Olavarria & Company of New York for a period of eighteen months. Olavarria & Company caused Wisconsin to be organized as a wholly owned subsidiary Wisconsin corporation for the purpose of processing cane sugar and assigned the lease to it. Under the terms of the lease the lessee agreed to pay rent on the basis of a fixed sum per bag of refined sugar and a guaranteed minimum rental and had the right to use the trade name "Crystal Pure." The liabilities and the assets of Menominee were not assumed in the lease transaction and the lessee did not obligate itself to fulfil any orders or business of Menominee. There is no interest, control or ownership relationship between Menominee and Wisconsin and Olavarria.

About July 20th Wisconsin placed an advertisement in the Green Bay newspaper announcing employment was available and proceeded to hire campaign workers. The company obtained a list of names of Menominee's campaign workers from a Mr. Charlier, a former timekeeper at Menominee who was hired by Wisconsin as its personnel manager. Wisconsin also hired another Menominee supervisory employee as its plant engineer. Of the 165 campaign workers hired, 60 were former employees of Menominee, but there is no evidence Wisconsin con-

tacted such employees directly or other than through the public newspaper announcement.

Upon seeing the advertisement the petitioning union notified Wisconsin that it had a valid labor agreement with the union because Wisconsin was the successor and assign of Menominee and the union requested the recall of former employees according to their seniority. The denial by Wisconsin that it was the successor or assign of Menominee and it was bound in any way by the labor contract precipitated this controversy.

The complaint was originally filed on the theory the language of the contract relating to successor and assign was sufficient to bind Wisconsin to the contract. Normally under contract law such language would give a successor or assignee the benefits and subject it to the obligations of such contract only if it assumed the contract. Under one view of labor law, such language in a collective-bargaining contract made the issue of whether one was a successor or assign arbitrable under the contract. This view was taken by the dissenting member of the WERB. But after the decision of the WERB *John Wiley & Sons v. Livingston* (1964), 376 U. S. 543, 84 Sup. Ct. 909, 11 L. Ed. (2d) 898, held the determination of who was bound by a collective-bargaining contract was a question for the courts, not the arbitrator.

As stated by the union in its brief the question whether Olavarria and Wisconsin must arbitrate disputes arising under the collective agreement between the union and Menominee must be decided by federal law. *Local 174, Teamsters Union v. Lucas Flour Co.* (1962), 369 U. S. 95, 82 Sup. Ct. 571, 7 L. Ed. (2d) 593; *Tecumseh Products Co. v. Wisconsin Employment Relations Board* (1964), 23 Wis. (2d) 118, 126 N. W. (2d) 520. And as stated by the trial judge in his exhaustive opinion the "appropriate tribunal in this state to decide whether Wisconsin Sugar Company is the successor and assign of the agreement, whether it is now the employer party to that agreement and whether it is bound by the terms of

such agreement, is the Wisconsin Employment Relations Board, in the same respects as that Board is the proper tribunal to determine if Wisconsin and Menominee (assuming they were parties to the agreement) have violated the agreement and are committing unfair labor practice."

Since there is no dispute over the facts, the application of the "emerging federal common law" of collective-bargaining agreements is a question of law and the order of the WERB must be sustained on review if correct although based on other considerations.[1] The *Wiley Case* is the only supreme court pronouncement on the issue presented in this case. *Wiley* involved a merger of Interscience Publishers, Inc., which had a collective-bargaining agreement with a union involving about one half of its employees with *John Wiley & Sons*, a larger publishing company. As a result Interscience's entity ended and its employees were taken over *en masse* by *Wiley*. *Wiley* refused to recognize the bargaining agreement as applicable to the employees formerly covered thereunder and claimed the merger terminated the bargaining agreement. The court rejected this argument and held *Wiley & Sons* had a duty to arbitrate under the contract because, aside from any effect of a merger under contract law, the merger did not automatically terminate all the rights of the employees and the duty to arbitrate would survive if there existed "a relevant similarity and continuity of operation across the change in ownership." Such fact was found in the *Wiley* merger by the wholesale transfer of Interscience's employees to the *Wiley* plant apparently without difficulty. This conclusion of when the duty to arbitrate survives a change in ownership of a business

[1] The petition for review of the WERB decision was filed June 13, 1963. While this petition was pending *Wiley* was decided on March 30, 1964. Thereafter on May 25th the matter was heard by the court and the *Wiley Case* was relied upon by the union as being applicable. On March 11, 1965, the court filed its decision based upon the *Wiley Case*. No request was made to the circuit court to have the matter sent back to the WERB for taking additional testimony and redetermination in view of the *Wiley* decision.

was grounded upon the important role which arbitration plays in effectuating the national labor policy and the importance of maintaining that policy of preventing industrial strife. To such an end, *Wiley* is an important addition to the federal common law on the subject of labor law.

We think *Wiley* stands for the principle that a collective-bargaining contract in reference to a particular plant or business survives a change in ownership of such business and binds the new owner and employer if there is a "relevant similarity and continuity of operation across the change in ownership," and conversely, "We do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives. As indicated above, there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved."

We agree with the union in its statement of the issue, "under applicable federal law, Olavarria and Wisconsin can only avoid arbitration of their disputes with the union if they are able to show that there is an absence 'of any substantial continuity of identity in the business enterprise before and after' the time Wisconsin became the employer of campaign workers at Menominee's sugar refining plant."

The union argues that a lack of any substantial continuity of identity in the business enterprise cannot be shown because Wisconsin, like Menominee, continued to hire campaign workers to refine "Crystal Pure" sugar cane at the Ashwaubenon plant where they performed the same work on the same or same type of equipment. It is further argued that Wisconsin's hiring other campaign workers in addition to hiring Menominee campaign

workers is unimportant because the other workers were hired at the expense of other former Menominee employees. Likewise, there was no lack of continuity of employment because campaign workers are seasonal employees and finally, there is no significant difference in refining cane sugar rather than beet sugar. In addition to *Wiley* the union relies on *United Steelworkers of America v. Reliance Universal, Inc.* (3d Cir. 1964), 335 Fed. (2d) 891, and *Wackenhut Corp. v. International Union United Plant Guard Workers* (9th Cir. 1964), 332 Fed. (2d) 954.

In the *Reliance Case,* Martin Marietta which had entered into a collective-bargaining agreement with the union was ordered by the federal trade commission to divest itself completely of its Bridgeville plant. Martin Marietta sold the Bridgeville plant as a going concern to *Reliance* which assumed all the obligations of the business except for an express disclaimer of the obligations of any collective-bargaining agreement. In spite of this disclaimer the court held the duty to arbitrate survived the sale and *Reliance* was bound by the collective-bargaining contract as establishing the law of the shop and constituting the basic charter of its labor relations. Difficulties of adaptation which might arise because of changed circumstances were to be considered in the arbitration process of specific grievances as they arose under the agreement. The court correctly disregarded the disclaimer in applying *Wiley* because: (1) It was against federal public policy where a going concern was taken over, and (2) contract law was not the decisive factor in determining whether the duty to arbitrate survives the transfer of the ownership of the business.

In *Wackenhut* the General Plant Company entered into a labor contract and during its term sold substantially all its assets to *Wackenhut* which carried on the same business without interruption. This was primarily a service organization and the employees were taken over *en*

*masse.* The court found a substantial similarity of operation and continuity of operation of the business identity before and after the change in ownership. We think these two cases properly applied *Wiley* to the sale of going businesses.

But *Wiley* does not compel Wisconsin to recognize the labor agreement entered into by Menominee because there is a lack of substantial continuity of identity in the business enterprise before and after the change. Wisconsin did not acquire a going business. There was no sale of any assets or liabilities of Menominee or a transfer in any respect of a business. Wisconsin did not obligate itself to fulfil any contracts or other business transactions of Menominee. Wisconsin started its business from scratch, leasing a plant which had been closed almost seven months. There was no continuity of operation across the change. We think it is of some significance that Wisconsin's business was exclusively refining sugar from cane while Menominee's principal business was refining sugar from beets. While the end product was sugar, the two processes are different and the production of sugar was not the same business operated successively by Menominee and Wisconsin, at least not from the standpoint of the customers, creditors, and the public.

While the form of a transfer is not controlling we must recognize a lease transfers nothing of the business as distinguished from a merger or a sale. If there had been a sale of the business enterprise the leasing of the plant and machinery would have significance in determining continuity. Contrariwise, the lease standing alone without a sale of the business is significant with other factors in indicating a lack of a substantial continuity of identity in the business enterprise. The union argues the same general business was continuously conducted in the same plant from the standpoint of the campaign employees. While it is true the campaign workers are part-time employees there is no evidence the period from January

to July is normally an unemployed period for campaign workers. In addition, we do not think *Wiley* holds that the continuity of the identity of the business enterprise is to be determined solely from the standpoint of employees. The answer to the problem does not rest on any one element but the combination of many. To hold the duty to arbitrate survived would be to make the "duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved."

*By the Court.*—Judgment affirmed.